JUSTICE RICE
dissenting.
¶22 The painful implication of today’s decision is that the troubled nature of a teenager’s years within a home can render her relationship with her adoptive father “insufficient” to take from an estate as his child. See ¶ 18.1 disagree that the law requires such a holding.
¶23 The Court does not justify its decision as necessary by reason of the facts. The opinion is not fact-driven. Indeed, except for a brief reference that “the record supports” the findings of fact, the opinion is premised entirely on an analysis, which I believe to be flawed, of policy considerations. See ¶ 13 (“[t]he rationale of § 72-2-715(3), MCA, is set forth in the official comment”); ¶ 14 (“the commission comments to the California Code, and the policy noted in several California cases are helpful”); ¶ 15 (“[t]his policy has been followed by the California courts”); ¶ 16 (“[t]he same policy was recognized in Pittman v. Goris”); ¶ 17 (“[t]he underlying policy of [§ 72-2-715(3), MCA] is to limit the ability of the adopting parent”); ¶ 19 (“given the underlying policy of § 72-2-215, MCA”).
¶24 Although I believe this case should be decided by a straightforward application of the law to the facts, I turn first to the Court’s policy analysis. The Court has over-played the policy background, which does nothing more than explain why this statute was enacted in the first place: “[to preclude] the adoption of a person (often an adult) solely for the purpose of permitting the adoptee to take under the testamentary instrument of another” (¶ 15, emphasis added); and “generally children who are adopted as adults should be excluded from class designations” (¶ 16, emphasis added). The uniform act was drafted and adopted by our Legislature to codify this policy. Section 72-2-715(3), MCA, incorporates the policy by setting forth the general rule-that children adopted as adults are excluded from intestate succession. But the statute does not end there; it incorporates a narrow exception to that general policy for those adopted adults who lived “while a minor” as a “regular member of the household of the adopting parent.” Section 72-2-715(3), MCA.
*263 ¶25 The Court attempts to stretch the policy considerations which drove the enactment of the general rule into a directive to interpret narrowly the rule’s already narrow exception. I submit that the authority it offers for this policy extension does not support such an interpretation.
¶26 First, the Court offers In Re Estate of DeLoreto (2004), 118 Cal. App.4th 1048, 1054, for the proposition that “the statute should be strictly construed so as to discourage ‘adoptions made for the purpose of becoming beneficiaries of the estates of unsuspecting testators.’” ¶ 15. In DeLoreto, the testator bequeathed income to his three children and the corpus to his grandchildren. About twenty years after the testator’s death, one of his sons adopted two adults, who were also his deceased wife’s niece and grandniece. Neither of these in-laws of the son had ever resided with him or his deceased wife. “Each, during her entire minority, was a regular member of her natural parents’ household, was supported by her natural parents and never looked beyond her natural parents for lodging or support.” DeLoreto, 118 Cal.App.4th at 1052.
¶27 The adopted adult in-laws argued that the uniform act “should be liberally construed to include close family members who resided while minors as regular members of an in-law’s household.” DeLoreto, 118 Cal.App.4th at 1054 (emphasis added). It was in the context of denying the in-laws’ request to expand the statute to persons far beyond its plain wording that the DeLoreto court said that “strict application of [the statute] ... will ... discourage adoptions made for the purpose of becoming beneficiaries of the estates of unsuspecting testators.” DeLoreto, 118 Cal.App.4th at 1054.
¶28 The Court distances itself from DeLoreto’s obvious distinctions by stating it is relying on DeLoreto “for its policy only,” but its references to DeLoreto for “strict application” of the statute are misleading for two reasons: (1) DeLoreto used “strict application” to reject expansion of the statute to adopted adults who had never resided with the adopting parent (not the issue here); and (2) the “strict application” rale was not used by DeLoreto to require a narrow interpretation of the exception allowing adopted children to demonstrate their membership of the household as minors (the issue here).
¶29 The Court next asserts that the “same policy” noted in DeLoreto was also recognized in Estate of Pittman v. Goris (1980), 104 Cal.App.3d 288. Pittman enunciated a common law rule which was similar to what would become the uniform act. It first held, similar to the general rale of our statute, that “generally the exclusion of adult adoptees from class designations ... established in pre-1951 wills *264 probably best comports with the inferred intention of the testator ....” Pittman, 104 Cal.App.3d at 294-95. Also like our statute, it then crafted an exception to the general rule for adult adoptees “who had actually been taken into the adoptive parent’s home and family as minors and who were reared by the adoptive parent in ‘loco parentis.’” Pittman, 104 Cal.App.3d at 295. The Pittman court explained that this exception “would most closely accord with the pattern of personal relationships a testator would envision as coming within the class designations ....” Pittman, 104 Cal.App.3d at 295.
¶30 Again, however, the “policy” alluded to in Pittman was for the purpose of adopting the rule itself, not to guide an assessment of the relationship between the adopting parent and the child. Poignantly, Pittman was decided on factual grounds-that “no evidence” was introduced that the adult adoptees had ever lived with the adopting parent as minors. Pittman, 104 Cal.App.3d at 295. Forced to decide the case on the record, the Pittman court nonetheless outlined the potential which the case had held:
All that is shown by the petition for instructions was that the men were adopted as adults. In the reporter’s transcript of the hearing below, however, we note that in respondents’ counsel’s oral argument, he states that the adoptees were stepchildren of Hubert Lloyd; that they were taken into his home in their early teens when Lloyd married their mother; that they were reared in the Lloyd home, left for the service, returned to the home after the service and left on the occasion of their marriages. There also appears to be acquiescence on the part of one of appellants’ attorneys that the represented state of affairs did exist. Counsel’s argument, however, is not evidence in the case and cannot be relied upon to support the trial court’s order.
Pittman, 104 Cal.App.3d at 295. It is difficult to miss the similarities between these facts and the facts in the case before us, to which I now turn.
¶31 Sharon McGregor, Lisa’s mother, moved with her family to Virginia City in 1979 following the dissolution of her prior marriage, as noted in the District Court’s findings. The court’s findings, however, do not discuss the evidence of the parties’ relationship before they began living together. According to Sharon’s testimony, about four months after her move to Virginia City, Ford and Sharon became acquainted and he began asking her to date. Initially, Sharon demurred, as she felt she was not yet ready for a relationship. Eventually, she began dating Ford, but even then “my children were my priority.” Thus, the couple dated over the next couple years, during *265 which time Ford “included my children in our activities, going to the lake, going skiing, going to movies in Bozeman, going to dinner. He always included them,” according to Sharon. She further testified that, during this time before they lived together, Ford expressed his positive feelings toward her children and that:
You know, Ford, he bought them, he liked to buy imaginative toys, the large toys. He bought them things like that. I know he bought them birthday presents and he bought them Christmas presents, plus, you know, the gifts of ski packages, things like that.
About two years after they met, Ford took Sharon and her two children, Lisa and Torrey, on a month-long winter trip to Hawaii. During the trip, which Sharon used to measure the group’s ability to get along, Ford did very well with the children and helped them complete a month’s worth of homework assignments:
And amazingly enough, it was Ford that was the real enforcer, you have to do homework. And he would sit up until late at night helping them. He was very patient with them. He was like, he treated them like his children, like he would if it was his very own children.
Following their return from Hawaii, Sharon gave serious consideration to Ford’s offer for her family to move in with him, and consulted with the children:
Q. How come you didn’t move in the first time that he asked you?
A. I had to talk to the children. You know, we had this trip. We had to see how we got along. We talked about it. And I had to like, you know, just sort of ask them how they felt about everything, you know, we were there more than at home. And we just had to all sit down and it took more than an hour, or one evening. We talked about it for a couple weeks at least, maybe more.
Q. Did you discuss with Ford the fact that you needed to make sure that the children approved?
A. Oh, yes.
Q. What did he say about that?
A. He thought that was great. He wanted the kids to have a say-so in it.
Q. Did you talk to the children about moving in?
A. Yes, I did.
Q. What was their response?
A. At that point they were happy to. They were getting along great with Ford. They liked the idea. And they also didn’t like to be alone a lot. They wanted people around them. You know, *266 having somebody there in the evening is good, and having somebody cook for them so they don’t have to cook for themselves, they thought that was great.
Q. And did you think that this was a good thing for your children?
A. I did. I thought about it very carefully. And like I said, I wouldn’t have moved in if the children hadn’t agreed to it also.
Thus, about six months after returning from the Hawaii trip, Sharon and her family moved into Ford’s house. The District Court, of course, could not make a finding on every detail, but its two-sentence review of the parties’ relationship prior to living together does not adequately illustrate that the move-in was preceded by a two-and-a-half-year relationship. Lisa was eleven when Sharon began dating Ford and was thirteen when she moved with her family into Ford’s house. The move was a deliberate decision which was preceded by a lengthy friendship, including one between Ford and Lisa.
¶32 In preparation for the move-in, Ford had his house remodeled to create two new bedrooms, one for Lisa and one for Torrey. The house formerly had only one large bedroom, which was occupied by Ford and Sharon, but was expanded to accommodate the children’s needs. Further, Ford took an active role in providing for the children in various ways:
Q. And so when you moved into Ford’s house, and Lisa and Torrey moved in with you, did you pay rent or pay any expenses?
A. No, I didn’t. Ford took care of everything.
Q. When you say took care of everything, what does that mean?
A. Well, children need food, they need clothes, they need school clothing, they always need new shoes, they need new coats because it’s cold there. They need school supplies. They need medical and dental.
And there was always something coming up, and it’s a lot of money. And Ford took care of all of that. We talked about it. He wanted to do that and he said he would do that.
Q. And he said he would pay for those kinds of expenses?
A. You know, we didn’t discuss specifically, you know, are you going to pay for this. Ford knew what it took to take care of children. I mean, he already knew. And so like when a dental thing came up, there was no question that, you know, Ford would take them to the dentist. And we didn’t really discuss it. Ford just knew that he was going to take care of things like that.
Q. And you knew that he was going to do that?
A. I did. Because I knew how he felt about them.
Q. And did Lisa need dental work?
*267 A. Yes, she did.
Q. What did she need?
A. She had toothaches. We thought she needed braces. He told her he would get her braces if she needed them. And just fillings and maintenance. But she had to have a root canal at one point. And you need to, Ford took care of all of that.
Q. Do you have any idea how much Ford spent on those kind of expenses, on the dental expenses?
A. Thousands.
Q. Over $1,000?
A. Oh, yes.
Q. Did he ever complain about having to pay that?
A. Never.
Q. Did he ever complain about having to pay any expenses that you just recited for the children?
A. Never did. In fact, when the children had to go ask for it, because I would not have the money, he seemed really pleased that, you know, that they had to come to him and that he could say, oh, yeah, sure I’ll get you that pair of shoes, or I’ll take care of this and that. I mean, he was happy to do it.
Q. Happy to do it?
A. With what he, he seemed to just beam when Lisa would go, my tennis shoes have a big hole or I ripped my jeans [on] the fence, I need a new pair of jeans. And he’d go, when do you want to go? Or can your mom drive you?
And he seemed happy that he could like do that. He was like sure, I’ll get you that. And he would have her show him the shoes. Show me your shoes. And he’d go, yeah, you need new shoes. He did that with everything.
¶33 Lisa lived in Ford’s house with her family for two years. She thereafter attempted suicide on three occasions in 1983-1984, was adjudicated a youth in need of care in 1985 and left town when she graduated from high school in 1986.
¶34 The District Court acknowledged that certain findings “weigh in favor of Lisa such as living in Ford’s house for a period of time, the fact that he apparently at the time referred to her as his daughter and mentioned adoption, that he taught her some skills and the fact that he supported her during the time she was there.” However, the court ultimately concluded that “[i]t cannot be said that Ford stood in the relationship with Lisa of ‘in loco parentis.’ ”
¶35 With all due respect, the statute does not require that Lisa prove that she and Ford had established a relationship in the nature of a *268 child-parent relationship. It merely requires that Lisa was a “regular member of the household.” The statute requires a decidedly more objective review of “cold” facts surrounding Lisa’s living situation than the demonstration of a parental relationship, as undertaken by the District Court, would require. When the facts are viewed under the statute’s plain words, a different conclusion is compelled than that reached by the District Court.
¶36 Lisa first became acquainted with Ford during the two-year period that preceded living with him. She was part of family discussions and a family decision to move in with Ford which was intended to be a permanent relocation of the family. Ford remodeled his house to provide a bedroom for her. He provided food, clothing, medical care, transportation, recreation and gifts to her. These facts are essentially undisputed. Ford was a troubled man, Lisa was a troubled teenager, and the nature and extent of his contribution to her overall well-being is certainly arguable. Quite possibly he was more of a detriment than a help during her teenage years. However, this should not change the outcome. The things which Ford did for Lisa are those which are done only for one who is a regular member of the household.
¶37 A word about the policy underlying the statute. First, while Ford no doubt had mixed motives, it cannot be said from this record that Ford’s adoption of Lisa was “solely for the purpose” of permitting Lisa to take from her grandmother’s estate. As the District Court found, Ford discussed adoption of Lisa while she was a minor. Secondly, a consideration of policy should include the thought that children who are adopted often do not come into the household at birth. Often times they arrive as stepchildren or foster children, perhaps as teenagers, and their time in the household before departing as an adult is often short. The statute does not penalize them for this time disadvantage, and we should not either. Thus, I believe Lisa’s claim is not undermined under these circumstances by the relatively short duration, two years, of her stay in the household.
¶38 I would reverse.
CHIEF JUSTICE GRAY joins the dissent of JUSTICE RICE.